## In re JOHNSTON.

District Court, W. D. Virginia, at Roanoke.
March 12, 1932.

W. J. Henson, of Roanoke, Va., for bankrupt.

James D. Johnston, of Roanoke, Va., pro se.

PAUL, District Judge.

Vivian D. Johnston was adjudicated a bankrupt upon his voluntary petition filed on July 11, 1929. Thereafter, on the 4th day of June, 1930, he filed his petition for discharge and objections to the granting of the discharge having been filed by James D. Johnston, a creditor, the questions raised by said objections were referred to W. S. Engleby, Roanoke, Va., as a special master to consider and report thereon.

The special master filed his report on October 31, 1931, finding that the objections to the discharge were not well founded, and recommended that a discharge be granted. To this report the objecting creditor filed his exceptions, and the matter comes before the court upon the report of the special master and the exceptions thereto. The original specifications of objections to the discharge of the bankrupt were four in number.

Specification No. 1 was to the effect that the bankrupt had knowingly and fraudulently made false statements in the schedules filed with his petition, in that he had listed as a creditor in the amount of $23,000 the Farmers' & Merchants' Credit Corporation of Roanoke; whereas it is claimed that at the time of filing his petition he did not owe the creditor named any such sum, but that the amount named, or an approximate amount, was owing by the bankrupt to James D. Johnston, the objecting creditor, who had been indorser on notes to the amount named, and by virtue of his indorsement had taken up or paid off the notes owing to the Farmers' & Merchants' Credit Corporation.

It appears that James D. Johnston, objecting creditor, had been a partner with the bankrupt in an automobile business at Roanoke, conducted under the name of Johnston Motor Company. This business was begun about 1919. Vivian D. Johnston was the active manager of this business, and James D. Johnston appears to have had little knowledge of the actual manner of conduct or progress of the business, although he apparently furnished the larger part of such financial strength as the business had. This business venture was apparently a losing one, and its affairs came to a crisis in July, 1923, at which time it owed large sums to various banking institutions. As far as appears from the evidence, the Johnston Motor Company did not continue an active business after July, 1923, but for the next several years the partners were engaged in adjusting and paying the obligations owed to the various banks, and appear to have finally paid these off during the course of the year of 1925, most of the money for this purpose being furnished by James D. Johnston. It is not clear what business or employment Vivian D. Johnston engaged in after the closing down of the Johnston Motor Company up until about the time, or shortly before, he filed his petition in bankruptcy. It appears that at the time the petition in bankruptcy was filed, and possibly for a short time before, he was employed by a manufacturing company at Covington, Va. It will be noted, therefore, that the business of the Johnston Motor Company was discontinued and finally wound up during a period of from four to six years previous to the filing of the petition in bankruptcy. This seems worth while to be noted in view of the fact that the acts of the bankrupt, which are the basis for the objections to his discharge, with one exception, occurred while the Johnston Motor Company was in existence, which was, as above stated, from four to six years before the bankruptcy.

In the course of this business, the Johnston Motor Company had become indebted to the Farmers' & Merchants' Credit Corporation in approximately the amount set forth in the schedule, and James D. Johnston, as indorser on the notes evidencing this indebtedness, was compelled to pay, and did pay, the larger part, if not the entire amount, of the indebtedness, and these payments had been made before a petition in bankruptcy was filed.

From the schedules it appears that the bankrupt, in listing this indebtedness upon which he was, of course, liable as a partner, listed the same as due to the Farmers' & Merchants' Credit Corporation and James D. Johnston, making such notation as would indicate that the debt was primarily due to the Farmers' & Merchants' Credit Corporation, and that James D. Johnston was an indorser on the notes. The objection is now raised that this is a false statement, in that the bankrupt knew that the credit corporation had been paid off and that any indebtedness owing by the bankrupt was due to James D.

Johnston, who had taken up the notes as indorser thereon.

It seems to the court that this objection is not sufficient to deny discharge to the bankrupt on the ground that he made knowingly false statements in his schedule. Possibly the bankrupt knew, or had reason to believe, that the entire debt due the credit corporation had been paid off by James D. Johnston, but, had he undertaken to list James D. Johnston as the creditor on this debt, it would have involved the ascertainment of just what amount had been paid on the debt by James D. Johnston and the further ascertainment of just what amount the bankrupt was due to contribute to James D. Johnston as an equal partner in the concern which had been the primary debtor. Of course, this might have been done, but the bankrupt apparently knew that he was liable for the full amount of the debt to some one, and he proceeded to list the debt as one due to the credit corporation to which it had been originally due, and at the same time made it clear by his schedules that James D. Johnston was an indorser on these notes. It was perhaps carelessness not to have figured out more accurately just the amount of the bankrupt's liability on this debt and the person or persons to whom the money was owed at that time, but certainly no harm was done to any one by listing the debt in the manner in which it was set forth, for it is made clear in the schedule that the indebtedness was one originally due to the credit corporation on notes which were indorsed by James D. Johnston. The mere technical fact that at the time the petition was filed the credit corporation had ceased to be a creditor because the indorser on the notes had paid them off is not sufficient to permit the court to say that the bankrupt made a knowingly false and fraudulent statement in his schedules.

■ The second specification of objections to the discharge is the statement that the bankrupt destroyed, mutilated, falsified, and concealed the records relating to the conduct of his business and failed to keep proper books of account and records from which his financial condition and business transactions might be ascertained.

The principal difficulty about relating this charge, and also the other specifications which will be hereinafter discussed, to the bankruptcy grows out of the following facts:

As previously stated, the Johnston Motor Company went out of active business some five or six years before the petition in bankruptcy was filed by Vivian D. Johnston.

There is probably little doubt that during the existence of the business its records were not well kept and that in other respects it was carelessly and wastefully handled.

James D. Johnston was the principal financial backer of the business, but was inactive in the conduct of the business, and knew little about it. As is very frequently the case, he was deceived or misled by the optimism of his partner, and, when the collapse of the business finally came, James D. Johnston awoke to find himself heavily involved. As a result of this, he seems to feel very strongly against the bankrupt, and, in his objections to the discharge of the bankrupt, he has gone back a number of years to charge the bankrupt with various delinquencies relating to the conduct of the automobile business in which they were partners. None of these, however, can be related to or connected with the bankruptcy, except that it appears that it was during the time when the business was operated that there were incurred the liabilities which so reduced the financial resources of the bankrupt that he never recovered therefrom, and was forced five or six years after the business had been closed out to go into bankruptcy.

It seems that the allegations as to the failure of the bankrupt to keep proper books of account, etc., as set forth in specification No. 2, relate to the fact that the objecting creditor claims that during the years when the Johnston Motor Company was actively engaged in business the records of the company were not carefully kept, and that during the hearings in the bankruptcy proceeding the bankrupt was called on to produce certain checks and furnish other papers which had been executed some years before and which he is now unable to do. It is not surprising that in the winding up of the business of the Johnston Motor Company and in the moving of the bankrupt from one home to another some of his papers or records should have been lost, and it is not to be expected that some years afterward he could produce each check or other instrument that might be called for; and, while it is possibly true that the records of the business were not kept with that degree of care shown by well-organized business enterprises, there is nothing in the evidence upon which to found the belief that the bankrupt willfully destroyed, mutilated, or concealed any pertinent records relating to the conduct of his business.

■ The third specification of objections relates to a matter which carries a somewhat more serious suggestion against the bankrupt

and seeks to establish the charge that he obtained money or property on credit by making a materially false statement respecting his financial condition. This again relates to an incident occurring during the active existence of the Johnston Motor Company and involves a letter written, or supposed to have been written, on February 18, 1922, and which is in the following words:

"Roanoke, Va., Feb. 18, 1922.
"Farmers' & Merchants' Credit Corp., Roanoke, Va.

"Gentlemen: This is to advise that Vivian D. Johnston is President and manager of the Johnston Motor Co., a partnership composed of he and myself.

"He has authority to sign any papers in connection with the business.

"Yours very truly,
"Jas. D. Johnston."

The allegation is made, and I believe that the evidence sustains it, that James D. Johnston, as one of the partners, had given insistent advice to Vivian D. Johnston that none of the banking transactions of the Johnston Motor Company should be had with the Farmers' & Merchants' Credit Corporation; that none of the customers' notes, which formed the chief basis of credit for the Johnston Motor Company, should be discounted with the Farmers' & Merchants' Credit Corporation. Disregarding this advice, Vivian D. Johnston, the active manager of the business, applied to this credit corporation to handle accounts and notes for the Johnston Motor Company. The credit corporation, having been advised that James D. Johnston was interested in the motor business, required Vivian D. Johnston to furnish a letter or statement, signed by James D. Johnston, assuring them that he (James D. Johnston) was a partner in the business, and that Vivian D. Johnston was authorized and empowered to transact business for the partnership. The bankrupt thereupon, without the knowledge of James D. Johnston, wrote the letter above set out, signing the name of James D. Johnston to it, and presented it to the Farmers' & Merchants' Credit Corporation, which took the letter in the belief that it was a bona fide communication from James D. Johnston and extended credit to the Johnston Motor Company upon the faith of it.

It will be noted that this letter does nothing more than to state facts which were true without the writing of the letter. It would not increase or change in any way the legal liability of James D. Johnston on the paper of the Johnston Motor Company. The letter simply states that Vivian D. Johnston was president and manager of the Johnston Motor Company, and that the Johnston Motor Company was a partnership composed of Vivian D. Johnston and James D. Johnston, and that Vivian D. Johnston had authority to sign any papers in connection with the business. Entirely aside from the writing of this letter, it was a fact that Vivian D. Johnston and James D. Johnston were partners, and, this being the case, Vivian D. Johnston, as a partner, had the right to sign papers in connection with the business and to bind his partner thereby. All of these facts were true whether the letter was written or not. But the fact does remain that credit would not have been extended to the Johnston Motor Company except for the writing of this letter; and, had it not been written, the indebtedness at the Farmers' & Merchants' Credit Corporation, which James D. Johnston was later compelled to pay, would probably not have been incurred.

The letter was not a false statement of fact as far as its contents are concerned, but it was false in that it had never been signed by James D. Johnston; and this falsity was the occasion of the extension of credit to the Johnston Motor Company. Whether or not under ordinary circumstances such a statement of facts would justify a finding that the bankrupt had obtained money or credit upon a materially false statement in writing is an interesting question. But it does not seem material here because of the fact that James D. Johnston, upon learning of the existence of this letter, ratified it, if not expressly, at least by the strongest implication. According to the evidence, James D. Johnston learned for the first time that the Johnston Motor Company was doing business with the Farmers' & Merchants' Credit Corporation, contrary to his advice, some twelve or fifteen months after the date of the letter referred to. Learning that the indebtedness to the Farmers' & Merchants' Credit Corporation was a very considerable amount, and the latter concern having pressed for substantial payments upon the account, certain officers of the Farmers' & Merchants' Credit Corporation met with Vivian D. Johnston and James D. Johnston in July, 1923, to discuss the status of the indebtedness of the Johnston Motor Company. It may be that at this meeting James D. Johnston learned for the first time that the Farmers' & Merchants' Credit Corporation held this letter, purporting to have been written by him and upon which they had extended credit to the Johnston Motor Com-

pany, or it may be that he learned of the existence of the letter shortly before the meeting. However that may be, it is quite clear that at this meeting this letter was discussed, and, according to the testimony of Mr. Adams, representing the Farmers' & Merchants' Credit Corporation, James D. Johnston did not repudiate the act; and, in fact, thereafter the Johnston Motor Company continued to do business with the Farmers' & Merchants' Credit Corporation with the full knowledge of James D. Johnston.

James D. Johnston, himself, in his testimony, states that on learning of the existence of the letter he talked with Vivian D. Johnston about it in private, and presumably reproached Vivian D. Johnston for having written the letter, but specifically states that he did not tell the representatives of the Farmers' & Merchants' Credit Corporation that he had not written the letter or that it was a forgery, and it appears that he did not disavow the authenticity of the letter in any way, and that the business between the Johnston Motor Company and the Farmers' & Merchants' Credit Corporation continued. James D. Johnston states that he was very much incensed with Vivian D. Johnston because of the writing of this letter, but did not take any steps against him criminally, and that pride in the family name "led me to go on and help pay off this indebtedness"; and it appears that the Johnston Motor Company did continue to do business with the Farmers' & Merchants' Credit Corporation relating to this indebtedness which had been created on the strength of the alleged fraudulent letter. This course of conduct seems to me to constitute a ratification and approval of the action of Vivian D. Johnston in writing the letter—certainly in so far as a recognition of the validity of the debt incurred upon the strength of the letter. All of this was from five to seven years before the bankrupt filed his petition in bankruptcy; was during the time when the Johnston Motor Company was a going concern; and cannot be related to or connected with the bankruptcy of Vivian D. Johnston in the sense in which such fraudulent actions are condemned by the Bankruptcy Act (11 USCA). James D. Johnston, having ratified the letter in question to the extent of recognizing the indebtedness incurred on the strength of it, which indebtedness has long since been paid off by James D. Johnston, now seeks to resurrect this incident, occurring a number of years before the bankruptcy, and offer it as an objection to the discharge of this bankrupt. While this incident may be evidence of the manner in which James D. Johnston was deceived some years ago by his partner when they were in business together, and may furnish strong evidence of why this business enterprise proved disastrous to James D. Johnston, and while it may prove also that the business conduct of Vivian D. Johnston at that time was open to severe condemnation, it cannot, in my opinion, be taken as a proper cause now to deny a discharge to this bankrupt.

The fourth specification of objection to the discharge of the bankrupt was to the effect that the bankrupt, while insolvent, had concealed his property from his creditors and had kept the same hid and concealed until after his adjudication and had kept the property concealed from the trustee in bankruptcy with intent to hinder, delay, and defraud his creditors. This contention revolves around various deeds of trust which the bankrupt placed upon different portions of his property from time to time from the year of 1922 until 1927, each of which purported to secure debts previously incurred by Vivian D. Johnston or to secure loans obtained when the deed of trust was executed. The testimony as to these deeds of trust and their purposes is rather vague, and no attempt will be made to analyze the nature or effect of these respective transactions. It is sufficient to say that all of these transactions occurred anywhere from eighteen months to seven years before the petition in bankruptcy was filed. They indicate more than anything else the situation of a debtor deeply involved, who attempts to raise money by loans upon the property owned by him, shifting the security from time to time and piling second liens upon first. They are, of course, presumed to have been legitimate transactions, and no substantial evidence has been introduced to show that any of the purported loans involved fraud.

It is true that in the course of one of these transactions the bankrupt seems to have treated a Mrs. Jameson very unfairly by persuading her to release a first lien on property in order that he might make a larger loan, assuring her that her debt would be replaced by a second lien, which he failed to do, but this transaction did not constitute any concealment of property within the meaning of the Bankruptcy Act (11 USCA § 32 (b).

It appears also that the sums of money which Vivian D. Johnston received as the proceeds of the liens on his property are accounted for, and, in fact, a considerable por-

448

tion of the money thus received was used in paying off the debts of the Johnston Motor Company. It may be added that no attack was ever made by James D. Johnston or any one else upon the good faith of these deeds of trust at the time they were given, and no direct attack has yet been made on them. Now they also are resurrected and sought to be used as reasons preventing the discharge of this bankrupt. The court is of the opinion that this objection to the discharge of the bankrupt is not tenable.

After this matter had been referred to the special master, and after considerable evidence had been taken, the objecting creditor undertook to file further grounds of objection to the discharge of the bankrupt, charging in substance that the bankrupt had given false testimony in his examination before the referee in relation to his bankruptcy. The special master, being of the opinion that these additional grounds of objection came too late, did not formally consider the same, although expressing the opinion in his report that they are without merit.

■ I am of the opinion that the referee was right in his view that the objecting creditor had not the right to assert additional grounds of objection to discharge without first applying to the court for permission to do so, but the court is willing to waive any technical objections to these additional grounds and to consider them along with those originally asserted. The charge that the bankrupt gave false testimony during the course of his examination is attempted to be substantiated by the fact that the bankrupt, in answering a number of questions asked him, gave such answers as "I don't know" or "I don't remember"; it being charged that the answers given were evasive and false because of the fact that the questions to which such answers were given were such as that the bankrupt must necessarily have been able to answer directly. Most of these answers were in response to questions asked in the course of an examination as to various checks that had been given persons with whom the bankrupt had dealt, dates of various transactions, all of which had occurred a good many years before the examination of the bankrupt. A careful reading of the transcript of the bankrupt's testimony does not indicate that he was deliberately evasive or that he was answering falsely to any of the questions asked him. On the contrary, the testimony of the bankrupt appears to me to have been frank and fair, considering always that there was involved the recollection of incidents happening years before. This objection to the discharge is without merit.

The special master has written a carefully prepared and studious report in this matter in which he has discussed and cited the principles of law applicable to each of the objections raised to the discharge. Reference is made to that report for an elaboration and for a more technical discussion of the reasons here given for holding that nothing has been shown justifying the withholding of a discharge. The exceptions to the report of the special master are overruled, and the report will be confirmed.